UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: APR 1 7 2018

United States of America,

     -v-

    15-cr-95 (AJN)

Carletto Allen,

    MEMORANDUM OPINION &
    ORDER

          Defendant.

ALISON J. NATHAN, District Judge:

On November 13, 2017, Defendant Carletto Allen was convicted of four counts after a jury trial: racketeering conspiracy in violation of 18 U.S.C. § 1962(d); narcotics conspiracy in violation of 21 U.S.C. § 846; narcotics possession in violation of 21 U.S.C. § 841; and a firearms offense in violation of 18 U.S.C. § 924(c). *See* Dkt. No. 1918 (Verdict Form); Dkt. No. 1786 (S8 Indictment). Allen now moves for a judgment of acquittal. *See* Dkt. No. 1925 (Allen Memo). He argues, first, that there is insufficient evidence to support a conviction of racketeering conspiracy; second, that there is insufficient evidence to support a conviction for possession of a firearm in furtherance of or in relation to drug trafficking; third, that the Court improperly allowed the introduction of a state court plea transcript at trial; fourth, that the Court should have given the jury a multiple conspiracies instruction; and fifth, that the Court should not have permitted evidence of Allen's courthouse statement to a cooperating witness. Allen Memo. For the reasons that follow, the Court rejects each of those arguments and denies Allen's motion.

## I. BACKGROUND

### A. The Indictment

On October 17, 2017, the Government filed a superseding indictment against Allen. S8 Indictment. The indictment alleged that Allen, also known as "Loso," was a member or associate of the Big Money Bosses (BMB) street gang, a faction of the Young Bosses, or YBz, street gang. *Id.* ¶¶ 1-2. According to the indictment, BMB members referred to themselves as "Blamma," "Money Making Mafia," or "Triple M," and the gang operated mainly in an area of the Bronx between 215th Street and 233rd Street near White Plains Road. *Id.* ¶ 2. BMB members and associates committed acts of shooting against rival gangs like 2Fly YGz, the Slut Gang, and the YSGz, and they also sold narcotics to benefit the gang. *Id.* ¶¶ 3-4. The Government alleged that from at least 2011 to 2016, Allen conspired with others to participate in the conduct or affairs of BMB through a pattern of racketeering activity, including the distribution of marijuana. *Id.* ¶ 9. The indictment charged Allen with participating in a racketeering conspiracy in violation of 18 U.S.C. § 1962(d) and a narcotics conspiracy in violation of 21 U.S.C. § 846, and with narcotics possession in violation of 21 U.S.C. § 841 and a firearms offense in violation of 18 U.S.C. § 924(c). *Id.* ¶¶ 9-15.

### B. Statements from State Court Proceeding

In its motion in limine filed on October 9, 2017, the Government requested to admit statements Allen made during a guilty plea allocution in a prior state court proceeding arising from Allen's arrest for attempted criminal possession of a weapon in the second degree on January 9, 2015, near White Plains Road and East 220th Street in the Bronx. Dkt. No. 1768 at 6-8. At the final pretrial conference, the Court ruled that the statements were admissible because they were admissions by a party opponent and thus not hearsay under Federal Rule of Evidence

801(d)(2)(A). Dkt. No. 1808 at 10:22-24. The Court also explained that the statements were not offered to prove Allen's character but were instead direct evidence of the criminal enterprise and of Allen's involvement in the conspiracy. *Id.* at 10:10-19.

Allen submitted a supplemental motion in limine after the conference seeking to preclude introduction of the statements because Allen had moved pro se in state court to withdraw his plea on grounds of ineffective assistance of counsel. Dkt. No. 1841 at 1-4. The Court ruled that the supplemental motion in limine was effectively a motion for reconsideration and thus denied it. Dkt. No. 1860 at 4. The Court explained, though, that it would have denied the motion on the merits anyway because the statements were admissible as admissions by a party opponent. *Id.* The Court stated that Allen was "free to demonstrate why the jury should not give much or any weight" to those statements. *Id.* at 5.

On the morning of the first day of trial, November 6, 2017, the Court discussed with counsel whether a limiting instruction regarding the statements might be appropriate. *See* Tr. 4:2-6. The Court first stated, "This is like many out-of-court statements that come in at trial, something that the jury has to evaluate what weight, if any, to give to it, and the defense can do what it would like to try to, as an appropriate evidentiary matter, undermine the value that the jury gives to it." Tr. 4:13-18. The Court further explained, "I see no rule, no law, no authority for the idea that where there is not a withdrawn plea, but simply a collateral attack or an appeal with respect to a plea, that it can't be used as an out-of-court statement." Tr. 8:25-9:4. The parties agreed to a limiting instruction that stated:

> You have heard statements that the defendant made in a prior criminal proceeding. You should evaluate what weight, if any, you wish to give to those statements using the same tools you would use evaluating any other testimony or evidence, and you should determine, as you would with any other evidence, what relevance, if any, it has with respect to the crimes charged here. You may

not consider those statements as evidence that the defendant is of bad character or has a propensity to commit crime.

Tr. 378:22-379:5; *see also* Tr. 11:15-13:3 (discussing the appropriate instruction).

Defense counsel again sought to exclude the statements in a conference during trial on November 8, 2017. In response the Court explained:

> [W]hat we have here is an out-of-court statement of Mr. Allen that, as an evidentiary matter, is permissibly admissible. If, as with any out-of-court statements of Mr. Allen that are being offered in this trial, there are evidentiary-appropriate means by which to encourage the jury not to deem it true, not to give it weight, not to give it much weight or to understand it differently, that opportunity is here. If Mr. Allen had said what he said in a text message, it would come in, and there wouldn't be a question of it not coming in because his lawyer told him to say it or any other story that might be told.
> The only thing, as far as I understand it, the only thing defense is pinning this on is the fact that there is a pending *pro se* motion to withdraw the plea. The plea—the not-yet final conviction, because there hasn't been sentencing—that is not what is coming in. It is Mr. Allen's statements that I just have been given no basis for being able to conclude that they don't come in.

Tr. 357:3-20. Accordingly, the Government was permitted to introduce the statements at trial.

The Government thus read into the record sections of the transcript from the state court proceeding. In particular, the Government read in Allen's statement that he possessed a loaded firearm on January 9, 2015, in the Bronx. Tr. 571:20-23. The Court then provided the agreed-upon limiting instruction. Tr. 573:19-574:3.

### C. Witness Testimony

At trial, the Government called four witnesses: an undercover police officer (the UC) with the New York City Police Department (NYPD), a former NYPD detective (Victor Navarro), a current NYPD detective (Jeremiah Williams), and a cooperating witness (the CW). For the defense, Allen testified.

4

The UC testified, relying on his contemporaneous report, that on April 9, 2013, he purchased $15 worth of marijuana from Allen at the corner of 225th Street and White Plains Road. Tr. 61:20-21; Tr. 62:9-10, 19-25; Tr. 64:4-11; Tr. 65:10-11, 18-19.

Detective Navarro testified, relying on his arrest report, that on April 9, 2013, he arrested Carletto Allen on the corner of East 225th Street and White Plains Road. Tr. 130:25-131:8. Detective Navarro stated that the UC had purchased drugs from Allen before Allen's arrest, and the Government introduced the recovered marijuana into evidence. Tr. 140:2-12; Tr. 141:2-15; Tr. 142:11-23. Detective Navarro explained that the packaging of the recovered marijuana was consistent with marijuana packaged for resale rather than for personal use. Tr. 142:24-143:2. Detective Navarro also testified that he recovered additional marijuana from Allen's left shorts pocket. Tr. 146:2-11. That recovered marijuana was also admitted into evidence. Tr. 146:22-147:6.

Detective Williams testified that he arrested Allen on January 9, 2015, in the Bronx. Tr. 475:5-8. He stated that he observed Allen sitting in the passenger seat of a car, smoking a lit marijuana cigarette in plain view. Tr. 477:19-478:3. Detective Williams then jumped out of his car, opened the door of Allen's car, and grabbed Allen's hand holding the marijuana cigarette. Tr. 479:10-20. When Detective Williams grabbed Allen's hand, he saw the handle of a black firearm in Allen's jacket pocket. Tr. 479:22-480:11.

The CW, a member of BMB and Money Making Mafia, testified extensively about the Big Money Bosses. He stated that BMB members had a signature handshake, Tr. 199:5-22, and that when they saw each other they would say, "Big Money! Big Money!" Tr. 199:23-200:10. The CW also explained that BMB controlled the area of White Plains Road from Gun Hill to 233rd Street. Tr. 196:25-197:4. In particular, he testified that BMB sold drugs on the corner of

225th Street and White Plains Road, Tr. 209:3-5, and he explained that only members of BMB or Triple M or individuals with permission from those gangs could sell drugs in such an area, Tr. 209:7-24. According to the CW, Allen was allowed to sell marijuana in BMB's territory. Tr. 210:4-11. Indeed, the CW explained that Allen sold marijuana to BMB members at a discount and that Allen would not have been allowed to sell marijuana on White Plains Road if he had not done so. Tr. 253:2-14.

The CW explained that he first learned about Allen selling marijuana when one of the CW's friends (Boogie), a member of BMB, expressed a desire to buy marijuana, someone suggested that the friend contact Allen, and another member of BMB shouted out, "That's my son. Buy weed from Loso, he got it." Tr. 215:5-6; *see* Tr. 211:25-215:6. Boogie thus purchased marijuana from Allen, and then gave some of that marijuana to another BMB member to resell. *See* Tr. 215:8-13; Tr. 215:25-216:24.

The CW testified that from approximately December 2014 until January 2015 he sold marijuana, and he bought the marijuana that he sold from Allen. Tr. 211:18-23. When he first purchased marijuana from Allen, the CW bought an ounce, and he paid less than Allen initially wanted to accept. *See* Tr. 219:9-220:21. Allen told the CW he was only accepting the lower amount because the CW was "da bro," which the CW understood to mean because he was BMB and Triple M. Tr. 220:16-19. Allen then called the CW "Mister Big Money," and he and the CW "started yelling out, Big Money, Big Money." Tr. 220:25-221:3. The CW then began to purchase marijuana from Allen every other day from December 2014 until January 2015. Tr. 223:11-18. During that time period, Allen would greet the CW by saying, in Jamaican patois, "what's up Mr. Big Money," which the CW understood to be code for Big Money Bosses. Tr. 224:4-23. When the CW bought the ounce from Allen, he was planning on bagging it up into

6

smaller baggies to resell, and he asked Allen where to get the baggies. Tr. 221:16-222:14. Later, the CW once placed the marijuana he had purchased from Allen into baggies to resell in front of Allen. Tr. 226:12-16; Tr. 227:5-17.

The CW also stated that Allen sold marijuana to other members of BMB. Tr. 228:13-24. At least two of those sales occurred in the 216 Park, a park controlled by BMB, Tr. 230:11-24; Tr. 231:8-17, and after one such sale the BMB purchaser started bagging up the marijuana to resell while Allen was still present, Tr. 231:21-232:5.

The CW further testified that Allen once mentioned to the CW that he was going to Edenwald, and the CW was surprised because the YSGz, a rival of BMB, occupied that area. Tr. 251:2-10. When the CW asked Allen if he was going to sell marijuana to the YSGz, Allen assured him that he was not, because, according to the CW, Allen knew that there would be a serious problem if Allen was selling marijuana to BMB's rival. Tr. 251:12-252:24.

In February and March 2016, Allen and the CW were housed in the same building at a detention facility. Tr. 277:2-6. The CW informed Allen that, while Allen had been incarcerated, a rival gang had shot a member of BMB and a member of Triple M, and that BMB had gone to Edenwald and "shot 'em back up." Tr. 278:15-22. When Allen heard that news, he was "hyperactive" and "animated," and he said things like, "Damn, son. . . . Dang, I wish I was there." Tr. 278:25-279:8. While they were incarcerated together, Allen told the CW that he had been robbed shortly before being arrested and that Allen had shot at the person who had robbed him. Tr. 282:6-283:9.

For his part, Allen testified that on January 9, 2015, he received a call from someone named Chargie seeking to purchase marijuana from Allen. Tr. 651:17-6522:11. Allen agreed, and he met Chargie in Chargie's car, where he sold Chargie a "nickel bags of weed." Tr. 654:7-

11. Allen then stayed in the car with Chargie and smoked marijuana with him. Tr. 654:12-20. Allen admitted that a gun was in the back seat of the car in a jacket, but he denied that the jacket or the gun was his. Tr. 657:16-658:8. Allen testified that he had been arrested on January 9, 2015, and that he had pled guilty to attempted possession of a firearm. Tr. 661:8-12. However, he explained that when he had agreed, in the state court proceeding, that he had possessed a firearm on January 9, 2015, he had misspoken because he had intended to plead to attempted possession, not to possession. Tr. 661:18-662:3.

Allen also admitted that he sold marijuana to the UC and to the CW. Tr. 662:7-8; 664:4-7. In addition, he testified that he was arrested on March 26, 2013, at 224 White Plains Road for possession of marijuana and that he was carrying 34 nickel bags of marijuana at the time of his arrest, and that he ultimately pled guilty. Tr. 669:4-15. Allen insisted, however, that he only sold "nickel bags and dime bags," not ounces of marijuana. *See, e.g.,* Tr. 664:6-13.

### D. Courthouse Statement

On November 7, 2017, before the CW testified, the CW and Allen came into contact with each other. *See* Tr. 182:6-9. The Government brought the incident to the attention of the Court and informed the Court that it intended to elicit statements that Allen had made to the CW during their brief interaction. Tr. 182:6-15. According to the Government, Allen said to the CW, in sum and substance, "Damn boy, damn boy. Yo, Stef. Why did you tell? You only would have gotten three years." Tr. 182:10-11. The Court asked the Government to describe the relevance of that statement, and the Government explained that (1) it showed that Allen knew the cooperator and (2) it demonstrated consciousness of guilt. Tr. 238:9-19. The Court then set forth the legal framework governing the admissibility of the CW's statements:

> [T]he Sixth Amendment rights of a talkative inmate are not violated when a jail mate acts in an entrepreneurial way to seek information of potential value

8

without having been deputized by the government to question that defendant. . . . The Supreme Court has stated that the Sixth Amendment is not violated whenever, by luck or happenstance, the government obtains incriminating statements from the accused after the right to counsel has attached. Instead, the defendant must demonstrate that the police and their informant took some action beyond merely listening that was designed deliberately to elicit incriminating remarks.

Tr. 240:14-241:3 (internal citations omitted).

Defense counsel argued that the Marshals' failure to keep Allen and the CW apart was a deliberate act, though defense counsel could not say for what purpose that act was taken. *See* Tr. 185:7-187:12; 242:5-246:3.

The Court decided that it would be helpful to have additional factual investigation to better understand what happened and what the CW would testify to. *See* Tr. 246:5-11.

On November 8, 2017, the Court resumed consideration of whether to admit the CW's statements. *See* Tr. 353:8-12. The Government explained that it did not know exactly why Allen and the CW had been in the same place at the same time, Tr. 359:20-22, but stated that the CW had been upset after seeing Allen, and the Government repeated the contention that Allen had said to the CW, "Damn, boy. Damn boy. Yo, Stef, why did you tell? You would have only got three years," Tr. 360:5-13. The Court explained that the courthouse "does not have holding cells, so the logistics of [separating cooperating witnesses when there is a separation order] where two incarcerated individuals are coming into the courtroom at the same time are very difficult." Tr. 363:2-4. The Court then asked defense counsel if he had "any basis to conclude that there was any intentionality" on the part of the Government in arranging the run-in between Allen and the CW. Tr. 363:6-10. Defense counsel replied that he did not believe that the prosecutors or the prosecutor's office had done anything intentional, and he explained that his sole basis for believing that the Marshals had acted intentionally was the fact that Allen and the

9

CW were in the hallway at the same time. Tr. 363:13-366:1. After hearing from the Government and defense counsel, the Court found that there was "no basis to conclude that there was any intentionality on the part of the government to have [the CW] in any way elicit or solicit any kind of reaction or statements or comments from Mr. Allen." Tr. 366:4-9. The Court thus concluded that the Sixth Amendment did not prohibit the introduction of Allen's statements. Tr. 366:19-22.

Rather than hold a preliminary hearing to discover what the CW would testify to, the Court, with defense counsel's consent, allowed the Government to meet with the CW so that it could then present a full proffer to the Court. *See* Tr. 369:1-370:18. Accordingly, the Government met with the CW and then reported what it learned. The Government stated that the CW had been in a witness room off of the hallway outside the courtroom, but the Marshal told the CW that the CW would have to go back to the cell block because the Court was not ready for him to testify. Tr. 371:20-23. When the CW left the witness room, he saw Allen in the hallway, and they made eye contact. Tr. 371:24-25. Allen then said "Damn boy, Damn boy" approximately four times. Tr. 372:2. Allen left the hallway to go downstairs to the cell block, and the CW and his escort waited a minute before following, presumably to separate the CW and Allen. Tr. 372:7-10. When the CW got downstairs, he did not see Allen but he heard Allen shout, "Stef, why you tellin'? You didn't have to tell. You would have gotten no more than three years." Tr. 372:11-14. The CW had then heard Allen shout the CW's name about five times, and after the fifth time the CW responded, "Yo." Tr. 372:15-17.

After the Government's proffer, the Court repeated its finding that "based on what's been presented to me . . . there is zero indication that [the CW] was acting in any way at the urging or

10

encouragement of the government to solicit information from Mr. Allen." Tr. 374:12-16. The Court continued,

> It was an unplanned and unfortunate crossing of paths in the logistics of moving incarcerated individuals in and out of my courtroom. It sounds in part like it may have been due to an uncertainty with my schedule, which there were times that we were delayed yesterday in getting back to trial testimony as a result of hearing from counsel on arguments, legal issues, and the like, and a delay may have led to uncertainty as to the timing of moving of defendants.
> Again, there has been zero presented to me that would suggest any intentionality on behalf of either the prosecutors or the marshals . . . .

Tr. 374:16-375:1. The Court then concluded that because the proffered testimony was relevant, it would be allowed. Tr. 375:4-6.

At trial, the CW testified, "I was walking out of the witness room [and] I ran into Carletto in the hallway, and he started talking to me. I didn't respond, and he said, Damn boy, Damn, Damn." Tr. 468:18-20. The CW explained that Allen then went downstairs to the holding cell, and the CW followed a minute later. Tr. 468:23-469:1. The CW stated that when the elevator doors opened, the CW did not see Allen, but he heard Allen, and Allen "was like, Yo, Stef. Yo. Stef. Why you telling on me? Why you telling? Why are you telling? Why are you telling? You would have got no more than three years." Tr. 469:1-5.

When Allen testified, he described the conversation similarly. He stated that he said to the CW, "Damn, boy. Damn. That's crazy. Why you tellin'? You would have gotten less than three years." Tr. 668:20-22.

### E. Defense Charging Request

Although defense counsel did not originally propose a multiple conspiracies charge, it requested one at the charging conference after the close of the Government's case. Tr. 591:1-592:13. Defense counsel asserted that Count One, the racketeering conspiracy charge, "pleads multiple conspiracies, at least two." Tr. 560:7-12. When the Court asked defense counsel why a

11

multiple conspiracies charge was necessary, counsel referred to the acts of "bank fraud and passing counterfeit money and attempted robbery and murder" mentioned in the indictment, acts that the Court had already explained it would not mention in the charge. Tr. 595:14-596:15; Tr. 597:2-8. The Court also clarified that the indictment would not be sent back to the jury. Tr. 598:19-599:4. The Court then stated:

> I think the issue would be different if we were sending to the jury the full indictment or suggesting that the charges involved the predicate acts beyond those directly alleged to involve Mr. Allen. I would understand it there, but if we conceive of the conspiracy, as charged, to mean what we are instructing the jury he is charged with, I just am not seeing how there is a danger of the jury being confused as to the charged conspiracy and some possibility that they would be confused as to a broader charged conspiracy.

Tr. 600:3-12. Accordingly, the Court did not include the multiple conspiracy charge in the jury instructions. *See* Tr. 602:2-4.

### F. Defense Motion for Acquittal

At the close of the Government's case, Allen moved under Rule 29 for a judgment of acquittal on all counts. Tr. 559:9-561:17. The Court denied the motion. Tr. 560:5-6; Tr. 561:5-6, 13-15; Tr. 562:5.

## II.   SUFFICIENCY OF EVIDENCE

Allen argues that there was insufficient evidence to convict him of the racketeering conspiracy and firearms offense counts. Allen Memo at 1-7.

Federal Rule of Criminal Procedure 29(a) instructs the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A jury verdict must be upheld if "a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (internal quotation marks omitted). A judgment of acquittal is appropriate "only if the evidence that the defendant

committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (internal quotation marks omitted). In analyzing the sufficiency of the evidence, the Court views the evidence in the light most favorable to the Government. *United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002). The Second Circuit has specified that "[t]he traditional deference accorded to a jury's verdict 'is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (alteration in original) (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir.1992)). In addition, "[i]t is the province of the jury . . . to determine whether a witness who may have been inaccurate, contradictory, and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) (internal quotation marks omitted). Cross-examination and arguments to the jury are therefore "the proper place for a challenge to a witness's credibility." *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989).

Because Allen moved for acquittal at the close of the Government's case and the Court denied that motion, *see* Tr. 559-62, the Court may consider the defense case in evaluating the sufficiency of the evidence, *see United States v. Velasquez*, 271 F.3d 364, 371-72 (2d Cir. 2001). However, even if the Court did not consider the defense case, it would still deny Allen's motion.

## A. Racketeering conspiracy

Allen challenges his conviction for participating in a racketeering conspiracy. He contends that insufficient evidence was produced to convince a reasonable juror beyond a reasonable doubt that Allen knowingly associated with BMB. Allen Memo at 1-4.

Allen was convicted of conspiring with others to violate the racketeering laws of the United States, to wit 18 U.S.C. § 1962(c). *See* Verdict Form; S8 Indictment. That provision states, "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, through a pattern of racketeering . . . ." 18 U.S.C. § 1962(c). "[A] RICO conspiracy requires proof 'that a defendant agreed with others (a) to conduct the affairs of an enterprise (b) through a pattern of racketeering' . . . ." *United States v. Applins*, 637 F.3d 59, 77 (2d Cir. 2011) (quoting *United States v. Basciano*, 599 F.3d 184, 199 (2d Cir. 2010)). "[T]o be convicted as a conspirator, the government does not have 'to prove that a conspirator knew of all [of the] criminal acts by insiders in furtherance of the conspiracy'; rather, 'one must be shown to have possessed knowledge of only the general contours of the conspiracy.'" *Id.* (second alteration in original) (quoting *United States v. Zichettello*, 208 F.3d 72, 100 (2d Cir. 2000)). Indeed, the Court "need inquire only whether an alleged conspirator knew what the other conspirators 'were up to' or whether the situation would logically lead an alleged conspirator 'to suspect he was part of a larger enterprise.'" *Zichettello*, 208 F.3d at 99 (quoting *United States v. Viola*, 35 F.3d 37, 44-45 (2d Cir. 1994)).

Although, as the Government acknowledges, Dkt. No. 1997 (Gov't Opposition) at 3, Allen was not a member of BMB, significant evidence was produced to support a finding that

Allen knowingly associated with BMB by selling marijuana to BMB members and in BMB territory. The CW testified that he always saw Allen sell marijuana to BMB members at a discount, Tr. 253:2-10; that Allen had sold marijuana to the CW at a discount because, as the CW understood it, Allen knew that the CW was a member of BMB, Tr. 220:16-21; that Allen called the CW "Mister Big Money" the first time that Allen sold marijuana to the CW, Tr. 220:25; that the CW yelled, "Big Money, Big Money," after Allen sold him marijuana, Tr. 221:2-3; that the CW purchased marijuana from Allen every other day and Allen would greet the CW by saying, "what's up Mr. Big Money," Tr. 224:4-7; that the CW would not have allowed Allen to sell marijuana on White Plains Road if Allen had not sold the marijuana to the CW or to other BMB members at a discount, Tr. 253:11-14; that Allen sold marijuana to several BMB members besides the CW, Tr. 228:13-24; that the CW sold the marijuana that he purchased from Allen and that the CW once "bagged up" the marijuana for resale in front of Allen, Tr. 211:18-23; Tr. 227:5-17; that Allen sold marijuana wholesale and to users, Tr. 229:23-25; and that Allen sold marijuana to a BMB member in a BMB-controlled park, Tr. 230:13-24. In addition, the Government also produced evidence that Allen was interested in BMB's rivalries and opposed their rivals. The CW testified that Allen knew who BMB was "beefing with," that Allen was "beefing with them, too," and that Allen would not sell marijuana to individuals associated with the other gang because of the "beef." Tr. 252:2-24. Moreover, when Allen was in jail with the CW in early 2016, the CW updated Allen on the ongoing violence between BMB and its rivals, and Allen expressed excitement and said that he "wish[ed] [he] was there." Tr. 277-79. The evidence demonstrates that Allen "possessed knowledge of . . . the general contours of the conspiracy," *Applins*, 637 F.3d at 77, and that the circumstances would have logically led him to

"suspect he was part of a larger enterprise," *Zichettello*, 208 F.3d at 99. Sufficient evidence thus supports the racketeering conspiracy conviction.

## B. Firearms offense

Allen argues that the evidence produced at trial does not support a conclusion that Allen possessed a firearm *in furtherance of or in relation to* drug trafficking. Allen Memo at 4-7.

Section 924 provides that "any person who, during and in relation to any . . . drug trafficking crime . . . , uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall . . . be sentenced to a term of imprisonment of not less than 5 years." 18 U.S.C. § 924(c)(1)(A)(i). "A person may be convicted under § 924(c)(1)(A) for 'mere possession of a firearm' so long as 'that possession is "in furtherance" of a drug trafficking crime.'" *United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006) (quoting *United States v. Lewter*, 402 F.3d 319, 321 (2d Cir. 2005)). However, "the mere presence of a weapon at the scene of a drug crime, *without more*, is insufficient to prove that the gun was possessed 'in furtherance of' the drug crime." *Id.* (emphasis in original) (quoting *United States v. Castillo*, 406 F.3d 806, 814 (7th Cir. 2005)). Instead, the Government must establish a "nexus" between the firearm and the "drug selling operation." *Id.* The "ultimate question" is "whether the firearm 'afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking.'" *Id.* (quoting *Lewter*, 402 F.3d at 322). Thus "a drug dealer may be punished under § 924(c)(1)(A) where the charged weapon is readily accessible to protect drugs, drug proceeds, or the drug dealer himself." *Id.* at 62-63.

In this case, a gun was not merely present at the scene of a drug sale; instead, viewing the evidence in the light most favorable to the Government, Allen—a marijuana dealer—carried the gun while he made the sale. The CW testified that from December 2014 until January 2015, he

purchased marijuana from Allen every other day. Tr. 223:11-18. Allen testified that during this time period, on January 9, 2015, he sold someone named Chargie "nickel bags of weed" in Chargie's car and then stayed in the car with Chargie to smoke marijuana. Tr. 651-54. Officer Williams testified that on January 9, 2015, he saw Allen in a car smoking a marijuana cigarette, and when Williams opened the car door to grab Allen's hand, he observed the handle of a firearm sticking out of Allen's jacket. Tr. 475-80. In addition, the CW testified that while he and Allen were incarcerated together, Allen told the CW that someone had robbed Allen shortly before Allen was arrested and that Allen had later seen that person and shot at him. Tr. 282:6-283:9. Given the evidence that Allen sold marijuana, the CW's testimony that Allen fired a gun at someone he suspected of robbing him, and the evidence that Allen was carrying a gun during a marijuana sale, the jury could reasonably conclude that Allen used a gun "to protect drugs, drug proceeds, or . . . himself." *Snow*, 462 F.3d at 63. The evidence thus supports a finding that Allen possessed a firearm in furtherance of drug trafficking.

### III. INTRODUCTION OF STATE COURT TRANSCRIPT

Allen argues that the Court should not have permitted the introduction of Government Exhibit 301, the transcript of Allen's guilty plea allocution in state court for attempted possession of a weapon on January 9, 2015. Allen Memo at 7-9. After pleading guilty in the state court proceeding but before sentencing in that case, Allen filed a pro se motion to withdraw his plea on the grounds of ineffective assistance of counsel. The state court has not yet ruled on that motion, but Allen contends that, given the possibility that the plea will be withdrawn, the plea transcript should not have been admitted. *See* Allen Memo at 8-9.

Allen seems to be arguing that because he has a Sixth Amendment right to counsel at a guilty plea, and because Allen has challenged the effectiveness of his counsel's assistance, the

Court committed an error of constitutional dimensions in admitting the plea allocution. *See* Allen Memo at 7-9. However, Allen has cited no precedential authority for that argument. And as the Government notes, the plea transcript does not suggest that Allen's statements should be viewed as involuntary or untrustworthy. Gov't Opposition at 12; *see* GX 301.

The Court acknowledges that statements made during a guilty plea that was later ·withdrawn are not admissible against a defendant. Fed. R. Evid. 410(a). However, when the Court admitted the statements—and, as far as the Court is aware, as of the date of this Order— the state court guilty plea, though challenged pro se by Allen, had not been withdrawn. Accordingly, Federal Rule of Evidence 410 did not bar the admission of Allen's statements.

To the contrary, Federal Rule of Evidence 801(d)(2)(A) provides that statements by a party opponent are not hearsay if offered against that party. Moreover, "[e]vidence of prior criminal conduct is admissible under Federal Rules of Evidence 404(b) and 403 if it is relevant to an issue at trial other than the defendant's character, and if its probative value is not substantially outweighed by the risk of unfair prejudice." *United States v. Williams*, 205 F.3d 23, 33 (2d Cir. 2000) (quoting *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999)); *see also United States v. Edwards*, 342 F.3d 168, 176 (2d Cir. 2003) (stating that 404(b) evidence may be admissible for any purpose other than demonstrating the defendant's criminal propensity); *United States v. Andreadis*, 366 F.2d 423, 433 (2d Cir. 1966) (upholding admission of prior guilty pleas); *United States v. Frederick*, 702 F. Supp. 2d 32, 36 & n.5 (E.D.N.Y. 2009) (explaining that "a prior guilty plea allocution" was admissible because it was "a party admission" that constituted "direct, substantive evidence of the charged conduct"); *id.* at 37 (collecting cases holding that "evidence of a defendant's valid prior state-court guilty plea for similar or lesser included conduct is properly admissible in a subsequent federal prosecution").

Here, the statements at issue were admissions by a party opponent and thus not hearsay. *See* Fed. R. Evid. 801(d)(2)(A). Moreover, the plea allocution provided direct evidence of at least the firearms offense. In addition, because Allen was charged with a firearms offense, the statements were not more inflammatory than the charged crime. Furthermore, to guard against any undue prejudice, the Court provided a limiting instruction. *See* Tr. 573:19-74:3.

In any event, Allen suffered no prejudice from the introduction of the plea transcript at trial. As explained above, even excluding the statements contained in the transcript, sufficient evidence supports Allen's convictions.

## IV.    MULTIPLE CONSPIRACIES INSTRUCTION

Allen contends that the Court should have charged the jury on multiple conspiracies, though he grounds that argument in a reasoning largely different from that which he expressed at trial. *Compare* Tr. 595:14-596:11 (defense counsel explaining that the indictment contained references to "bank fraud and passing counterfeit money and attempted robbery and murder" but there was no evidence that Allen participated in those acts), *with* Allen Memo at 9 (stating that "the jury could have found Mr. Allen guilty of a variety of conspiracies with regard to" the racketeering conspiracy charge). Here, Allen asserts that a multiple conspiracy instruction was necessary because the Government sought to prove two distinct conspiracies as part of the narcotics conspiracy, and because the evidence at trial could have supported a finding of multiple conspiracies with regards to the racketeering conspiracy. Allen Memo at 9-10; Dkt. No. 2021 (Allen Reply) at 1-3.

Multiple conspiracies instructions are typically given only when there are multiple defendants and thus a "danger that the jury would confuse the possible involvement of other co-defendants with conspiracies not alleged in the indictment with the conspiracy for which [the

19

d]efendant was charged." *United States v. Choullam*, No. 05 Cr. 523, 2008 WL 3861356, at *4 (S.D.N.Y. Aug. 19, 2008), *aff'd*, 346 F. App'x 619 (2d Cir. 2009); *see also United States v. Corey*, 566 F.2d 429, 431 n.3 (2d Cir. 1977) (noting that "single/multiple conspiracy analysis does not apply to the trial of a single defendant"); *United States v. Sir Kue Chin*, 534 F.2d 1032, 1035 (2d Cir. 1976) ("We have been cited to no case which involves only one defendant and where a claim of multiple conspiracies has been sustained."); *United States v. Galtieri*, No. SS 88 Cr. 891, 92 Civ. 2087, 1992 WL 245499, at *3 (S.D.N.Y. Sept. 17, 1992) ("A defendant who stands trial alone is not entitled to a charge on multiple conspiracies.").

Here, Allen stood trial alone, so "there was no danger that the jury would confuse the possible involvement of other co-defendants with conspiracies not alleged in the indictment with the conspiracy for which [he] was charged." *Choullam*, 2008 WL 3861356, at *4. Moreover, the evidence at trial showed only one narcotics conspiracy and one racketeering conspiracy.

"'[T]o prove a single conspiracy,' rather than multiple conspiracies, 'the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.'" *United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008) (quoting *United States v. Berger*, 224 F.3d 107, 114 (2d Cir. 2000)). A single conspiracy may exist even when members do not know of each other's identities if (1) "the scope of the criminal enterprise proven fits the pattern of the single conspiracy alleged in the indictment, and (2) . . . the defendant participated in the alleged enterprise with a consciousness of its general nature and extent." *Id.* at 48 (quoting *United States v. Rosa*, 11 F.3d 315, 340 (2d Cir. 1993)).

As to the narcotics conspiracy, Allen contends that the Government sought to prove two distinct conspiracies—(1) that Allen sold marijuana to BMB members for resale, and (2) that Allen bought marijuana from wholesalers to resell. Allen Memo at 9. That Allen sold marijuana

for resale and purchased marijuana to resell does not demonstrate that Allen participated in two narcotics conspiracies. Instead, the evidence suggests that Allen was the middleman in a typical "chain conspiracy." *See United States v. Agueci*, 310 F.2d 817, 826 (2d Cir. 1962); *see also United States v. Parker*, 554 F.3d 230, 235-36 (2d Cir. 2009) ("[I]f the evidence supports a finding that [the buyer and seller] shared a conspiratorial purpose to advance other transfers, whether by the seller or by the buyer, [a conspiracy may exist.] . . . [A] hypothetical seller who is running a profit-motivated business of selling drugs in wholesale amounts . . . may well realize that his buyers' ability to buy and pay for substantial amounts of drugs, and hence, his profit, will depend on the buyers' ability to resell," and thus he may be found to have conspired with the buyer.); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 553 (S.D.N.Y. 2014) ("[I]n a narcotics conspiracy, a chain may be comprised of producers, exporters, wholesales, middlemen, and dealers.").

Even if the evidence at trial showed the existence of multiple conspiracies, Allen's substantial rights were not prejudicially affected by the lack of a multiple conspiracies charge. *See Choullam*, 2008 WL 3861356, at \*4 ("Even if defendant is correct that the proof at trial indicated the existence of multiple conspiracies, the Court concludes that Defendant's 'substantial rights' were not prejudicially affected by the lack of a multiple conspiracies charge." (citing *Sir Kue Chin*, 534 F.2d at 1035)).

Both the selling and buying by Allen "were clearly related to the essential elements of the conspiracy crimes charged in the indictment," *Choullam*, 2008 WL 3861356, at \*4, i.e., Allen's agreement with others to distribute and possess with intent to distribute marijuana. Allen contends that the alleged second conspiracy—that Allen bought marijuana from wholesalers to resell—was not charged in the indictment. Allen Memo at 10. But the indictment alleged that

21

Allen "and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States," and that the object of conspiracy was to "distribute and possess with intent to distribute controlled substances," namely marijuana. S8 Indictment ¶¶ 10-12. The allegations in the indictment easily encompass Allen's purchasing marijuana from wholesalers. Accordingly, there was no risk that the jury would convict Allen of a conspiracy not charged in the indictment.

As to the racketeering conspiracy, Allen argues that his "selling marijuana to various members to the gang for them to resell could be multiple conspiracies, unless there is evidence (and there is not) that the supposed-BMB members were working together in the sale of the marijuana." Allen Memo at 9-10. However, the CW testified that BMB sold drugs in certain areas, Tr. 209:3-5, that individuals could sell marijuana in those areas only with the permission of BMB, Tr. 209:7-24, and that Allen had permission to sell marijuana there because he sold it to BMB members at a discount, Tr. 210:4-11; Tr. 253:2-14. Moreover, the evidence at trial showed that Allen was aware that BMB members to whom he sold marijuana resold the marijuana. *See* Tr. 227:11-17 (the CW testifying that he "bagged up" for resale marijuana that he had purchased from Allen in front of Allen); Tr. 231:16-232:5 (the CW stating that a BMB member to whom Allen sold marijuana "started bagging up" the marijuana for resale in front of Allen).

Allen also argues that the evidence could have proved two different conspiracies—(1) that Allen conspired with BMB members to sell marijuana to the gang to support BMB, and (2) that Allen conspired with marijuana suppliers to buy marijuana and sell it to customers, some of whom were members of BMB. Allen Reply at 2. Allen contends that the second conspiracy was not charged in the indictment. Allen Reply at 2. However, in essence, the first conspiracy that

Allen describes is the racketeering conspiracy, and the second conspiracy described is the narcotics conspiracy.

Finally, to the extent that Allen is arguing that the jury could have been confused by acts of BMB mentioned in the indictment that did not directly involve Allen, *see* Allen Reply at 2, the Court addressed that possibility at trial and explained that because the jury would not receive the full indictment, there was no "danger of the jury being confused as to the charged conspiracy and some possibility that they would be confused as to a broader charged conspiracy," Tr. 600:9-12; *see also* Tr. 597:2-8 ("The Court: Well, I have . . . eliminated from the charge any predicate acts other than—well, this is with respect to the RICO claim, any predicate acts other than—well, other than marijuana related, right? [The Government]: That's it. We haven't asked the Court to put anything else in there but marijuana."); Tr. 596:12-15 (the Court agreeing with the Government that the Court had removed "all references to the other predicate racketeering acts [besides the distribution of marijuana] in the charge").

A multiple conspiracies instruction was therefore not appropriate in this case.

## V.    INTRODUCTION OF COURTHOUSE STATEMENT

Finally, Allen argues that the admission of testimony from the CW regarding Allen's statements to him in the courthouse corridor violated Allen's Sixth Amendment rights. Allen Memo at 10-11.

When a federal agent elicits statements from a defendant after the defendant has been indicted and in the absence of the defendant's counsel, the admission of those statements at trial would violate the defendant's Sixth Amendment rights, particularly if the defendant made those statements while unaware that a government agent was interrogating him. *See Massiah v. United States*, 377 U.S. 201, 206 (1964). But "[t]he Sixth Amendment rights of a talkative inmate are

not violated when a jailmate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant." *United States v. Birbal*, 113 F.3d 342, 346 (2d Cir. 1997). An informant generally becomes a government agent for purposes of the rule "only when the informant has been instructed by the police to get information about the particular defendant." *Id.* The Supreme Court has stated that "the Sixth Amendment is not violated whenever—by luck or happenstance—the [Government] obtains incriminating statements from the accused after the right to counsel has attached." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986) (quoting *Maine v. Moulton*, 474 U.S. 159, 176 (1985)). Instead, "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.*; *see also Rosa*, 11 F.3d at 329 (noting that the Sixth Amendment's obligation on the Government "not to solicit incriminating statements from the defendant in the absence of his counsel, . . . is not breached unless the government has taken some action 'that was designed deliberately to elicit incriminating remarks'" (quoting *Kuhlmann*, 477 U.S. at 459)).

According to Allen, the U.S. Marshals created a situation likely to induce Allen to make incriminating statements without the assistance of counsel by failing to ensure that Allen and the CW did not meet in the hallway. Allen Memo at 11. However, Allen has provided no evidence to suggest that the Marshals intentionally sought to have Allen and the CW encounter each other. Indeed, before admitting the testimony, the Court heard from both parties on the issue and found "zero indication that [the CW] was acting in any way at the urging or encouragement of the government to solicit information from Mr. Allen," Tr. 374:13-16, and stated that there had been "zero presented . . . that would suggest any intentionality on behalf of either the prosecutors or the marshals," Tr. 374:24-375:1. That Allen and the CW happened to see each other does not

suggest that the Marshals or the CW "took some action . . . designed deliberately to elicit incriminating remarks." *Kuhlmann*, 477 U.S. at 459. Instead, the evidence supports a conclusion that Allen and the CW's brief encounter "was an unplanned and unfortunate crossing of paths in the logistics of moving incarcerated individuals in and out of [the] courtroom" that "may have been due to an uncertainty with [the Court's] schedule." Tr. 374:16-19. As the Court explained, the courthouse "does not have holding cells, so the logistics of [separating cooperating witnesses when there is a separation order] where two incarcerated individuals are coming into the courtroom at the same time are very difficult." Tr. 363:2-4. Moreover, Allen himself testified about his statement to the CW in the hallway, and his account of the interaction was substantially similar to that described by the CW. *See* Tr. 668:20-22. The admission of testimony from the CW regarding Allen's statements to him in the courthouse thus did not violate Allen's Sixth Amendment rights.

## VI.    CONCLUSION

For the foregoing reasons, Allen's motion for a judgment of acquittal is denied.

SO ORDERED.

Dated:    April 1 7, 2018
       New York, New York

_____
ALISON J. NATHAN
United States District Judge

25